UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| REBIRTH CHRISTIAN ACADEMY DAYCARE, INC., | ) ) ) | |
| Plaintiff, | ) ) | 1:12-cv-01067-SEB-DKL |
| vs. | ) ) | |
| MELANIE BRIZZI, *et al.* | ) ) ) | |
| Defendants. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause is now before the Court on Defendants' and Plaintiff's cross-motions

for summary judgment, filed on June 16, 2014 [Docket No. 66] and July 7, 2014 [Docket

No. 68], respectively. Plaintiff Rebirth Christian Academy Daycare, Inc. ("Rebirth")

brings this action against Defendants Melanie Brizzi, in her official capacity as Child

Care Administrator for the Division of Family Resources of the Indiana Family and

Social Services Administration, and Debra Minott, in her official capacity as Secretary of

the Indiana Family and Social Services Administration (collectively, "the FSSA"),

pursuant to 42 U.S.C. § 1983, alleging that its procedural due process rights under the

Fourteenth Amendment to the United States Constitution were violated when the Indiana

Family and Social Services Administration terminated its status as an unlicensed child

care ministry without affording it access to an administrative appeal process. The Court

previously dismissed Rebirth's individual capacity claims, and thus, the only remaining

1

claim before us is Rebirth's request for injunctive relief.[1]  For the reasons detailed below, we <u>DENY</u> Defendants' Motion for Summary Judgment and <u>GRANT</u> Plaintiff's Motion for Summary Judgment.

**Factual Background**

**Licensed and Unlicensed Child Care Providers**

Generally, in order to legally provide child care in Indiana, child care homes and centers must obtain a license from the Indiana Family and Social Services Administration's ("FSSA") Division of Family Resources' ("DFR") Bureau of Child Care ("BCC"), which is the sub-agency of the FSSA that is responsible for overseeing child care providers in Indiana.  There are multiple licensure options, including child care homes (located in residential buildings) and child care centers (located in commercial buildings).  To be licensed, a child care provider must submit a paper application and supporting documentation and submit to site visits and inspections.  There is no application fee for licensure, but a child care provider must follow re-licensure

---

[1] The fact that significant time has passed since Rebirth's registration as an unlicensed child care ministry was terminated by the FSSA and the only remaining claim is one for injunctive relief raises some concerns regarding mootness.  However, we have to assume that this is an ongoing concern since the parties have not advised us otherwise and neither party has raised the issue of mootness.  In any event, it appears likely this situation would fall within the "capable of repetition" exception to mootness, which applies where "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks omitted).  As Rebirth has not indicated otherwise, we assume that it desires to resume operations as an unlicensed child care ministry.  Accordingly, it is reasonable to expect that Rebirth could be subject to these same actions by the FSSA in the future.

procedures every two years.  As of January 2014, there were 593 child care centers and 2,796 child care homes operating in Indiana.

Pursuant to Indiana Code § 12-17.2-6-1, *et seq.*, individuals or organizations may operate child care ministries without a license, however, provided that they register with the BCC and meet certain statutory and regulatory requirements imposed by the BCC and the Division of Fire and Building Safety.  Under Indiana law, a "child care ministry" is "child care operated by a church or religious ministry that is a religious organization exempt from federal income taxation under Section 501 of the Internal Revenue Code." IND. CODE § 12-7-2-28.8.  To become registered, an unlicensed child care ministry must submit a paper application to the BCC and pay a registration fee of fifty dollars; complete an application with the Department of Homeland Security for the state fire marshal and pay an additional fee of fifty dollars; and pass initial inspections by the State Fire Division Inspector and a BCC ministry consultant inspector.  Once an unlicensed child care ministry is registered with the BCC, it must re-register annually by completing a reapplication form, paying the same fees, and passing the renewal inspections.  If an unlicensed child care ministry at any time fails to meet the applicable requirements exempting it from licensure, it loses its exemption.  *See* IND. CODE § 12-17.2-6-9.  In such cases, if the unlicensed child care ministry desires to continue operating legally, it must either apply for and receive a child care center license from the BCC or reapply for an exemption to licensure.  *See* IND. CODE § 12-17.2-4-1; § 12-17.2-6-3.  As of January 2014, 653 unlicensed child care ministries were operating in Indiana.

**BCC Inspections and Plans of Improvement**

3

Regardless of their classification, all child care providers in Indiana are subject to regular inspections by the BCC. Licensed child care providers are inspected at least once a year while unlicensed child ministries are inspected at least twice a year. Child care providers may be inspected more frequently if a complaint is received or if follow-up visits are necessary. For the initial inspection, the BCC schedules a time with the child care provider beforehand, but all subsequent visits are unannounced. The purpose of the inspections is to ensure compliance with Indiana law and regulations.

If an inspection reveals what the BCC believes to be a violation of applicable laws or regulations, the child care provider is issued a "plan of improvement" or a "plan of correction." Brizzi Dep. at 28. These forms specify the statute or regulation that the provider has allegedly violated and provide a section in which the child care provider may explain how each "noncompliance" was corrected or will be corrected. Generally, this document is given to a provider on the date of an inspection and specifies a date by which the form must be returned to the BCC. The amount of time that a provider will be given to return the document and correct the violations depends on the type of violations alleged. "Critical violations," which are defined as a "failure to meet a health, sanitation/fire safety standard that may be detrimental to the health, safety, and/or life of a child/staff," must be corrected within ten calendar days of the violation. Carter Aff. Exh. 1 at 1, 62. "Non-critical violations" must be corrected within thirty calendar days of the violation. Carter Aff. Exh. 1 at 1.

According to the BCC, plans of improvement are intended to be part of a dialogue between the BCC consultant and the child care provider, allowing a provider to discuss

with the consultant any disagreements it might have with the violations found. The BCC claims that if a resolution cannot be reached through discussion, the provider can document their response in the plan of improvement or request additional discussion with the licensing consultant's manager, Lisa Clifford. However, it is not clear how these options are communicated to child care providers as there are no instructions on the plan of improvement regarding the manner in which a provider can challenge the factual or legal accuracy of the violations cited therein.

**Available Appeal Procedures**

In the event that a licensed child care provider fails to take the corrective action specified in a plan of improvement or fails to return the document within the allotted timeframe, the BCC will usually take one of the following two actions: deny the application/reapplication for licensure or revoke the child care provider's license. Although Indiana law also allows the BCC to suspend rather than revoke a license, this option is not typically used.[2] If any of these adverse actions is taken against a licensed child care provider, the provider has an opportunity to appeal the decision administratively through the Office of Hearings and Appeals of the FSSA and then to seek judicial review in a court of law. A licensed child care provider may continue to operate during the pendency of an appeal of a license revocation. In 2013, the BCC

---

[2] The BCC can issue a probationary license for up to six months for a previously licensed child care provider who is failing to meet the licensure requirements, during which the BCC increases monitoring visits to ensure that the provider comes back into compliance.

revoked the licenses of thirty-seven (37) child care homes, thirty-one (31) of which appealed the revocation, and of seven (7) child care centers, all of whom appealed.

If an unlicensed child care ministry fails to take the corrective action specified on a plan of improvement or fails to return the document within the specified timeframe, the BCC will terminate its registration as an unlicensed ministry. There is no administrative appeal process for a child care ministry to challenge the termination of its registration. In 2013, the registrations of ninety-one (91) unlicensed child care ministries in Indiana were terminated, but this number includes both voluntary and involuntary terminations.

Licensed child care providers who have had their licenses revoked as well as child care ministries who have had their registrations terminated both have the option of reapplying for a license or registration at any time during the calendar year. If a child care provider chooses to reapply in such circumstances, there is no increased monitoring, additional fees or training imposed as a result of the revocation or termination.

**Facts Concerning Rebirth Christian Academy Daycare**

Rebirth is a non-profit organization incorporated under the laws of the State of Indiana. In September 2009, Rebirth began lawful operations as an unlicensed child care ministry. Rebirth registered as such with the BCC and alleges that it has at all times met the statutory and regulatory requirements to operate as such. At the time it became a registered child care ministry, Rebirth was provided guidelines for unlicensed child care ministries contained in the "Interpretive Guide for Unlicensed Registered Child Care Ministry." Carter Aff. Exh. 1. The guide is a tool to assist BCC in communicating with

child care providers and it contains the relevant statutes and rules as well as information regarding what the BCC will assess during inspections.

In May of 2012, a representative of the BCC conducted an unannounced inspection of Rebirth.  According to the BCC, upon inspection, it determined that Rebirth was out of compliance with eight statutory and/or regulatory requirements.  At the conclusion of the inspection, Rebirth received a Plan of Improvement for Unlicensed Registered Child Care Ministries (State Form 50897) ("Plan of Improvement"), which listed the eight violations and identified steps Rebirth could take to cure the deficiencies.  These violations included, *inter alia*, the unavailability of a number of documents, such as shot records, parent notices, and criminal history checks; hot water temperatures exceeding 120 degrees; and improper coverage of refrigerated bottles.  Rebirth disputes all of these violations.  The Plan of Improvement provided instruction regarding the manner in which Rebirth could submit information demonstrating that it had cured the alleged deficiencies, but it did not provide a procedure for Rebirth to challenge the BCC's findings.  Rebirth did not complete and return the Plan of Improvement to the BCC within the timeframe permitted.

On June 8, 2012, the BCC sent Rebirth a letter stating as follows: "This is the official notification that the Certificate of Registration for your child care ministry, Rebirth Christian Academy … will be terminated effective June 22, 2012.  Exh. A to Am. Compl. ("Termination Letter").  This letter cited the same eight reasons for Rebirth's termination as were cited at the May inspection.  These reasons included:

- hot water in excess of 120 degrees (in violation of 470 IND. ADMIN. CODE 3-4.5-4(1));

- shot records unavailable (in violation of IND. CODE § 12-17.2-6-11(a)(2));

- parent notices unavailable (in violation of IND. CODE § 12-17.2-6-7);

- Criminal History Checks unavailable (in violation of IND. CODE § 12-17.2-6-14(1));

- Universal Precaution Certificates unavailable (in violation of 470 IND. ADMIN. CODE 3-1.1-33.5(b)(4));

- CPI checks unavailable (in violation of IND. CODE § 12-17.2-6-14(2)(c));

- refrigerated bottles not properly covered – preschool room (in violation of 470 IND. ADMIN. CODE 3-4.5-5(e)(2)); and

- all child care files for staff and children unavailable to the consultant at the time of the visit (in violation of IND. CODE § 12-17.2-6-4(a)).[3]

Carter Dep. Exh. 3. Rebirth disputes these violations and contends that it was not in violation of Indiana statutory or regulatory requirements.[4]

Upon receipt of the Termination Letter, Rebirth (through its counsel) contacted the BCC in order to request an administrative appeal of its termination. Melanie Brizzi, then

---

[3] According to the BCC, these are considered critical violations, and thus, fall within the ten-day timeline discussed above. However, the box on the Plan of Improvement triggering the ten-day deadline was unmarked when the document was provided to Rebirth.

[4] For example, Rebirth argues that none of the documents that were unavailable at the time of the inspection were in fact missing, but rather were locked for privacy purposes in a file cabinet to which no individual present at the time of the unannounced inspection had a key. Rebirth also contends that its water temperature was inspected by BCC on a number of previous occasions without incident and Rebirth had done nothing to alter the water temperature since those inspections. Additionally, Rebirth argues that there is no maximum water temperature set forth in the regulation cited by the BCC. Finally, Rebirth claims that the "refrigerated bottles" cited in the letter actually referred to only one bottle that had been temporarily left uncapped because it had just been used and thus was not violative of any regulation.

the Child Care Administrator and head of the BCC, responded by letter on June 29, 2012, informing Rebirth that it "does not have an administrative appeal review process before the Division of Family Resources." Exh. B to Am. Compl. Pursuant to the terms of the Termination Letter, Rebirth ceased operation as an unlicensed child care ministry on June 22, 2012. Since the termination of its registration, Rebirth has not reapplied for registration as an unlicensed child care ministry nor tried to apply for a child care license to operate a child care home or a child care center.

**The Instant Litigation**

Rebirth filed its complaint in this cause on July 31, 2012, alleging that the FSSA violated its procedural due process rights by terminating its child care ministry registration without providing an adequate opportunity to challenge the termination. The parties' cross-motions for summary judgment are now fully briefed and ready for ruling.

<u>**Legal Analysis**</u>

**I.     Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255.

However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*,

324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Courts often confront cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

## II.    Discussion

Plaintiff alleges that the FSSA deprived it of its procedural due process rights when the FSSA terminated its status as an unlicensed child care ministry without affording it the opportunity to challenge the underlying violations that resulted in the termination. To state a claim for a procedural due process violation, a plaintiff must establish: (1) a protected property interest; (2) a deprivation of that property interest by an individual acting under the color of state law; and (3) a denial of due process. *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012) (citing *Tenny v.*

*Blagojevich*, 659 F.3d 578, 581 (7th Cir. 2011)).  We address these elements in turn below.

### A.      Protected Property Interest

The "threshold question" in any procedural due process challenge alleging a deprivation of property "is whether a protected property interest actually exists." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011).  "A protected property right under the Fourteenth Amendment due process clause is something that 'is securely and durably yours under state (or … federal) law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain." *Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 509 (7th Cir. 2013) (quoting *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir. 1983)).  Property rights "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  Property interests exist "only when the state's discretion is 'clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met.'" *Booker-El*, 668 F.3d at 900 (quoting *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006)).

Here, Rebirth claims a property right in its certificate of registration as an unlicensed child care ministry.  As we previously addressed in our order on the FSSA's motion to dismiss, a child care ministry "*is* exempt from licensure" (emphasis added),

12

pursuant to Indiana Code § 12-17.2-6-1, as long as it complies with certain statutory requirements, including: registering with the division of family resources and the division of fire and building safety (IND. CODE § 12-17.2-6-2); complying with certain rules for fire prevention and permitting annual inspections (IND. CODE § 12-17.2-6-5); providing certain notices to the parents and guardians of the children it enrolls (IND. CODE § 12-17.2-6-7); including certain statements in any promotional and advertising materials (IND. CODE 12-17.2-6-10); paying certain registration fees (IND. CODE § 12-17.2-6-12; IND. CODE § 12-17.2-6-13); conducting criminal history checks of its employees and volunteers (IND. CODE § 12-17.2-6-14); and permitting unscheduled visits by custodial parents and guardians of the children it enrolls (IND. CODE § 12-17.2-6-15).

"[W]here state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir. 1988). Thus, for example, it is well-established that "[a] license to operate a business is … property if it cannot be taken away from the holder before the end of a definite period without proof of misconduct on his part…." *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1122 (7th Cir. 1983). This means that where a license "is revocable (or nonrenewable) only for cause, it is property for purposes of determining whether the state can deprive the licensee of it without according him due process of law." *Club Misty, Inc. v. Laski*, 208 F.3d 615, 619 (7th Cir. 2000) (emphasis removed). Similarly, here, the FSSA concedes that if an entity meets all of the above requirements, it is entitled to lawfully operate as an unlicensed child care ministry and continue to

operate as such unless and until it is determined to have violated an applicable statute or regulation rendering it ineligible for the exemption from licensure.

The FSSA attempts to distinguish between an "exemption from licensure" and "licensure" itself. However, as Rebirth points out, the Seventh Circuit has instructed that, to determine whether a property interest exists, courts "must look behind labels." *Reed*, 704 F.2d at 948 (citations omitted). Rather than being dependent on the semantics of "exemption" versus "license," whether the exemption from licensure is a property right depends only on whether the exemption from licensure is "securably and durably [Plaintiff's] under state … law" or whether it is held "subject to so many conditions as to make [Plaintiff's] interest meager, transitory, or uncertain…." *Id.* Rebirth's certificate of registration as an unlicensed child care ministry is clearly the former. Indiana law provides that child care ministries are entitled to the benefit of an exemption from licensure requirements as long as they are in compliance with the above referenced statutory and regulatory requirements. The statute confers no discretion on the part of the administrative agency to deny the exemption so long as the statutory requirements are satisfied.[5] Accordingly, it is clear that child care ministries cannot be denied the exemption from licensure unless specific conditions are met. Thus, we hold that Rebirth

---

[5] Although not completely clear in the briefing, the FSSA apparently contends that there nevertheless is no property right in the exemption because the determination of whether a child care ministry is in compliance with all applicable statutes and regulations is left to the discretion of the State. However, as Rebirth argues, accepting the FSSA's argument would essentially read the property-interest inquiry out of existence in the vast majority of cases because "when virtually any benefit or licensure program is governed by mandatory statutes or regulations, it is a governmental body that is tasked with determining whether a particular person or entity has run afoul of the mandatory requirements." Pl.'s Reply at 3.

has a legitimate expectation to the benefit derived from the exemption and therefore has shown that it has a property interest in its certificate of registration as an unlicensed child care ministry to which due process protections apply.[6]

## B. Deprivation of Property Interest

The FSSA argues that even if Rebirth has a property interest in the exemption from licensure, Rebirth was not deprived of its interest in operating a child care facility because it was free to immediately re-register for exemption of licensure as a child care ministry or to apply for licensure as a child care home or center in order to continue operations with little delay. Thus, according to the FSSA, because Rebirth had another avenue available by which it could legally provide child care, it was not deprived of any benefit when its registration was terminated. We disagree. Initially, we note that it is not clear on the record before us that Rebirth could meet the requirements for licensure as a child care home or child care center even if it chose to apply. But even if it were able to meet those requirements, the fact that Rebirth could have attempted to legally provide child care through an alternative method or by reapplying for another exemption does not mean that it was not deprived of the property interest it had in its original exemption from licensure as a child care ministry. Although the FSSA argues that there is no added

---

[6] The fact that Rebirth might be eligible to apply to be a licensed as a child care home or a child care center does not alter this analysis. It is not clear on the record before us whether Rebirth could legally operate as a child care home or center if it chose. But even if it could, Rebirth's entitlement to operate as an unlicensed child care ministry is not altered by the existence of some alternative available license. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254 (1970) (finding welfare benefits were a property right without inquiring as to whether alternative benefits programs were available to provide for the welfare recipients).

benefit to operating as an unlicensed child care ministry, it concedes that licensed child

care centers and homes are subject to additional requirements that unlicensed child care

ministries need not meet.  Rebirth chose to operate as an unlicensed child care ministry

and does not desire to be licensed as a child care home or child care center.  Although the

State clearly was not obligated to make available this alternative avenue of providing

legal child care in Indiana, having created a statutory and regulatory scheme that entitles

qualifying entities to operate as unlicensed child care ministries, it cannot now say that

the loss of that entitlement is not a deprivation.

### C.    Denial of Due Process

Having found that Rebirth has asserted a property interest in its status as an

unlicensed child care ministry and that it was deprived of that interest when the State

terminated its exemption from licensure, we turn to address whether the FSSA provided

sufficient process to pass constitutional muster.  The FSSA maintains that there was no

procedural due process violation here because constitutionally adequate process was

available to Rebirth either via informal remedies that would have resolved the violations

that led to the loss of its exemption or in the form of post-deprivation judicial remedies.[7]

_____

[7] The FSSA argues on several occasions throughout its brief that Rebirth "admits" to having
violated one or more of the statutory or regulatory requirements imposed on unlicensed child
care ministries.  If Rebirth had conceded that the FSSA's findings were accurate as to all
violations, we agree that such a situation might be problematic for Rebirth's case, particularly
with regard to standing.  While it is true that "[p]arties may suffer injury in fact from defective
procedures even if, at the end of the day, they would not have prevailed on the merits," a plaintiff
alleging a procedural due process claim must at least "assert[] some basis for contesting a
governmental deprivation of life, liberty, or property."  *Rector v. City & County of Denver*, 348
F.3d 935, 943 (10th Cir. 2003); *see Markadonatos v. Village of Woodridge*, 760 F.3d 545, 561
(7th Cir. 2014) (Sykes, J., dissenting) (discussing *Rector* and observing that "in a due process

Rebirth rejoins that neither the informal remedies to which the FSSA refers nor any post-deprivation judicial remedies are sufficient to satisfy the requirements of due process.

Due process "is flexible and calls for such procedural protections as the particular situation demands." *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (quotation marks and citation omitted). To determine how much process is required in a given situation, we apply the three-part balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976),[8] which requires the court to assess: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* In applying these principles to the case at bar, we find that an unlicensed child care ministry like Rebirth is entitled to more than the informal "plan of improvement" process or the post-deprivation judicial remedies that the FSSA argues were constitutionally sufficient here.

---

case, the plaintiff must … allege that he would have challenged *something* at the hearing that he contends is constitutionally required") (citing *id.* at 944). Here, Rebirth contests at least some of the alleged violations, and thus, a justiciable controversy exists. The fact that Rebirth may not have prevailed on its challenge to the FSSA's findings had it been afforded a hearing does not doom its procedural due process claim.

[8] Rebirth argues that this is a case in which there was no process provided, and thus, that application of the *Mathews* balancing test is inapplicable because it is obvious that the process given, to wit, none at all, was constitutionally insufficient. However, because the FSSA argues that the Plan of Improvement issued to Rebirth provided sufficient pre-deprivation process and also that adequate post-deprivation remedies existed to satisfy due process requirements, we apply the *Mathews* test to determine whether these procedures pass constitutional muster.

We agree with Rebirth that the interest at stake here, to wit, its interest in the continued operation of its child care business, is an important one. *E.g.*, *Ward v. Anderson*, 494 F.3d 929, 935 (10th Cir. 2007) ("[I]t seems self-evident that [the plaintiffs] have a significant interest in the health and success of their child-care business."); *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375, 1381 (9th Cir. 1989) ("[T]he private interest [in the continued operation of a child care business] was clearly substantial."). As Rebirth highlights, courts have consistently recognized a significant private interest in other forms of business licenses that, like Rebirth's exemption, allow a business to legally operate. *See, e.g.*, *Nnebe v. Daus*, 644 F.3d 147, 159 (2d Cir. 2011) (finding that "the private interest at stake [in the deprivation of taxicab licenses] is enormous"); *Spinelli v. City of New York*, 579 F.3d 160, 173 (2d Cir. 2009) (holding that the plaintiff's private interest in a gun dealer license was "strong"); *Kratt v. Garvey*, 342 F.3d 475, 483 (6th Cir. 2003) (recognizing that "[a] pilot's license is a sufficiently important interest that a licensee is entitled to some due process protections when it is revoked"). We also are mindful that "[t]he Supreme Court has repeatedly recognized the severity of depriving someone of the means of his livelihood."[9] *Nnebe*, 644 F.3d at 158 (internal quotation marks and citations omitted). Accordingly, this factor weighs in favor of Rebirth.

---

[9] The FSSA argues that Rebirth's private interest is minimized in this case because its employees could potentially still have remained employed in other positions at the church, such as the board of directors. However, as Rebirth argues, the fact that other employment may have been available does not lessen the significance of the interest one has in their chosen employment.

We are also persuaded that there is an appreciable risk of erroneous deprivations resulting from the current procedures used by the FSSA.  As Rebirth argues, the determination of whether the registration of an unlicensed child care ministry should be revoked requires analysis of a number of Indiana statutes and regulations, including application of many requirements with largely subjective components, such as requirements that the building be "structurally sound" and that areas of the facility be "maintained in a clean, safe, and sanitary condition."  *E.g.*, 470 IND. ADMIN. CODE 3-4.5-4 (building must be "structurally sound and … maintained in a clean, safe, and sanitary condition"); 470 IND. ADMIN. CODE 3-4.5-5(a) (kitchen "shall be maintained in a clean and sanitary condition").

Here, for example, the FSSA found that Rebirth violated, among other provisions, Rule 3-4.5-4 of Title 470 of the Indiana Administrative Code by maintaining hot water in excess of 120 degrees.  However, Rule 3-4.5-5 does not specify any particular requirement with regard to water temperature, but rather requires only that the facility be maintained "in a clean, safe, and sanitary condition."  Inspectors of unlicensed child care ministries are thus required to make subjective determinations regarding compliance that can result in an inconsistent application of the rules.  Such inconsistency is illustrated in this case by the fact that although Rebirth's water temperature had not been altered after it passed the State's inspection on a prior occasion, it was found to be in violation of Rule 3-4.5-4 at the subsequent inspection at issue in this litigation.  The risk of erroneous deprivation under the regulatory scheme governing unlicensed child care ministries here

is therefore clearly higher than in situations in which adverse action results only from the application of easily determinable objective criteria. For these reasons, this factor also weighs in favor of some sort of an administrative appeals process.

The FSSA contends that its undisputedly compelling interest in the welfare and safety of children "would be negatively impacted by any lengthy administrative review process." Defs.' Br. at 20. However, an administrative appeals process already exists for licensed child care homes and centers and there is no indication that the State's interest in children's welfare and safety is being compromised as a result. The FSSA has failed to adduce evidence in the record to demonstrate how providing similar administrative procedures to unlicensed child care ministries would lead to children being placed in jeopardy.[10]

Moreover, as Rebirth argues, permitting the FSSA to obtain a temporary order within the context of an administrative appeal (as is already permitted with respect to licensed child care homes and centers) would address any such potential issue. In recognition of the substantial importance of the welfare of children, the State has already adopted rules at the direction of the Indiana General Assembly with respect to child care

---

[10] The FSSA highlights the fact that unlicensed child care ministries are subject to a "lower minimum standard" than licensed child care facilities and thus children cared for at such unlicensed facilities are more likely to be at risk than children in licensed facilities. Defs.' Br. at 21. The FSSA has adduced no specific evidence in the record to substantiate this contention. It is undisputed that certain requirements imposed on licensed child care facilities are not imposed on child care ministries, but we are not persuaded that these differing standards automatically subject children cared for by ministries to immediate danger upon violation of any applicable regulation.

centers and child care homes governing conditions that "pose an immediate threat to the life or well-being of a child in the care of a licensee." IND. CODE § 12-17.2-4-18.7(a); IND. CODE § 12-17.2-5-18.7(a). The list of these conditions is set forth in rule 3-4.8-1(a) of Title 470 of the Indiana Administrative Code, and when an employee of the State determines that any such violation exists, it has the duty to issue a temporary order "requiring the licensee to immediately cease operations" of the child care center or home and to notify the parents of the children being cared for at the center or home. There is no allegation that any of Rebirth's alleged violations at issue here are the type of conditions that the State has deemed pose such an immediate threat.

As we have previously recognized, the statutory and regulatory scheme governing unlicensed child care ministries includes various requirements, each of which may affect the health and safety of children to a different degree and with varying exigency. The fact that certain violations may require an immediate response does not justify a failure to provide sufficient process prior to deprivation for every violation across the board.[11] We agree with Rebirth that the State's interest is met by applying a more nuanced approach

---

[11] In *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603 (7th Cir. 2002), for example, the Seventh Circuit addressed a due process challenge to a procedure that required a state agency, upon concluding that it possessed a good-faith belief that an employee of a licensed child care provider committed child abuse or neglect, to inform the individual's employer that an investigation was being conducted. The action was ultimately dismissed on the basis of qualified immunity, but the Seventh Circuit first found such a process to be violative of the Due Process Clause, observing that while a state's interest in child welfare often requires significant and immediate action, it was not clear "that the system adequately differentiates among various forms of abuse and neglect" such that "[i]n certain circumstances, the exigencies that permit disclosure of an indicated finding to prospective employers prior to an administrative hearing simply may not exist." *Id.* at 619.

similar to that already applied to licensed child care centers and homes, to wit, allowing the FSSA to take temporary action without process upon a determination that one of the conditions recognized as being an immediate threat to child welfare is at issue, but providing procedures that afford notice and the opportunity for unlicensed child care ministries to be heard prior to terminating their exemptions in cases when such exigent circumstances are not present.[12]

The current procedures simply do not provide a level of process that comports with the due process requirements. The FSSA contends that the "plan of improvement" procedures and post-deprivation remedies available to unlicensed child care ministries are sufficient to pass constitutional muster. According to the FSSA, the Plan of Improvement provided Rebirth with constitutionally adequate process here, but Rebirth simply failed to take advantage of that process. Specifically, the FSSA maintains that because Rebirth had been issued at least seven other "plans of improvement" on prior occasions, it knew that the way in which to avoid "undue action" being taken against it

---

[12] We are also not persuaded that providing additional process in this case would place too high of a financial or administrative burden on the State. Although we agree that the State clearly has an interest in conserving limited fiscal and administrative resources, there has been no evidence adduced here to establish that such considerations justify a failure to provide adequate constitutional process. Ms. Brizzi did not indicate in her Rule 30(b)(6) deposition testimony that any administrative or financial consideration was the reason for the FSSA's failure to provide an administrative appeal to unlicensed child care ministries. Additionally, the FSSA has not contradicted Rebirth's evidence that although 3,400 licensed child care centers and homes operate in Indiana – five times greater than the number of unlicensed ministries – those entities filed only thirty-eight administrative appeals in 2013 (the most recent data in the record). Given these facts, we cannot find that any additional financial or administrative strain placed on the State as a result of providing process to unlicensed ministries will be so significant as to alter our analysis.

was to work with the FSSA to cure any defects.  According to the FSSA, any disagreements Rebirth had with the violations "would naturally come out in that arena; where Rebirth could say 'come and look again, and I can prove to you that your assessment is not correct.'"  Defs.' Reply at 6.

It is true that "a state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail [itself] of them."  *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982).  But the opportunity to cure alleged violations is not the same as the opportunity to challenge the finding of the violations in the first place.  As we noted in our prior entry denying Defendants' motion to dismiss, procedural due process rules are in place to "minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests."  *Carey v. Piphus*, 435 U.S. 247, 259-60 (1978) (internal quotation marks and citation omitted); *accord Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (recognizing that due process requires "a fair opportunity to rebut the Government's factual assertions").

Here, no evidence has been adduced from the record to establish that the "plan of improvement" process allows an unlicensed child care ministry to challenge the FSSA's findings in any meaningful fashion.  Rather, as Defendants concede, the Plan of Improvement merely provided Rebirth with ten days to "fix the problems" and/or show that it "was now compliant with the rules by providing evidence of its compliance" before its registration was terminated because "noncompliance with the exemption was

not corrected." Defs.' Br. at 19. A procedure like the plan of improvement process, by which unlicensed child care ministries are afforded time only to *correct* alleged violations, but not *challenge* them does not provide sufficient due process.[13] Moreover, since there is no formal appeal process as part of the plan of improvement, whether to allow a child care ministry to challenge violations would be a decision left solely to the discretion of the individual inspector. Such an ad hoc and unpredictable process can hardly be considered to comport with procedural due process standards.

Rebirth points out a number of additional constitutional deficiencies in the plan of improvement process, such as the fact that the plan of improvement clearly does not constitute a hearing. It is well-established under Seventh Circuit law that due process "requires 'some kind of hearing' unless the interest is *de minimis*." *Fleury v. Clayton*, 847 F.2d 1229, 1232 (7th Cir. 1988). As discussed above, Rebirth's interest in its continued operation of an unlicensed child care ministry is clearly more than *de minimis*. Moreover, the Supreme Court has recognized that for purposes of due process "an

---

[13] We also note that, even if the plan of improvement process allowed an unlicensed child care ministry to protest an alleged violation, there is no information on the plan of improvement form regarding any procedures, either formal or informal, for the entity to follow to do so. Accordingly, an unlicensed child care ministry would have no way to know that it could challenge the findings on the plan of improvement, which is a hallmark requirement for adequate notice. *See, e.g.*, *Wayt v. Town of Crothersville*, 866 F. Supp. 2d 1008, 1022 (S.D. Ind. 2012) (holding that process given water customer before termination of service "fail[ed] to provide adequate notice because it lacks information for the customers regarding method or process to dispute the pending termination"); *McIntosh v. Hudson*, 632 F. Supp. 2d 725, 738 (N.D. Ohio 2009) ("It is impossible for a [person] to make that decision [to appeal] if he, for want of notice, is completely unaware that an appeal is an option."); *Wolfe v. Randle*, 267 F. Supp. 2d 743, 749 (S.D. Ohio 2003) ("Because notice … is a foundation of Supreme Court case law, precedent mandates that due process is violated when a [person] is not informed of his right to appeal….").

impartial decision maker is essential." *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970). The FSSA is apparently contending that the consultant who issues the plan of improvement and with whom the licensed care ministry corresponds throughout the process is the decisionmaker. But the consultant is the one who makes the original decision regarding whether the unlicensed child care ministry is in violation of any applicable regulation, based on his or her own observations at the inspection. Thus, the consultant clearly cannot be considered impartial such that he or she could, consistent with due process, hear a challenge to his or her own findings. For these reasons,[14] the "plan of improvement" procedure, which does not provide a meaningful opportunity to be heard before an impartial decisionmaker does not meet constitutional standards of due process.

Nor is there evidence that post-deprivation remedies exist that satisfy the constitutional requirements of procedural due process. The FSSA argues that potential post-deprivation judicial remedies exist that provide sufficient due process to Rebirth. In support of its contention, the FSSA references available state tort remedies, citing to *Parratt v. Taylor*, 451 U.S. 527 (1981), for the proposition that such judicial remedies are constitutionally sufficient. We disagree. As the Seventh Circuit recently recognized in *Schepers v. Commissioner, Indiana Department of Correction*, 691 F.3d 909 (7th Cir. 2012), "the *Parratt* doctrine 'rest[s] on the principle that when a state officer acts in a "random and unauthorized" way – by unpredictably departing from state law, for

---

[14] In its briefing, Rebirth points out a number of other constitutional deficiencies related to the plan of improvement process, but we need not delve further into these issues as it is clear that the plan of improvement process does not satisfy the procedural due process requirements.

example – the state has no opportunity to provide a pre-deprivation hearing and may instead satisfy due process by providing an adequate post-deprivation remedy.'" *Id.* at 916 (quoting *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865, 872 (7th Cir. 2009)) (emphasis removed).  However, in cases where the state does have an opportunity to provide pre-deprivation process "because the deprivation is 'the result of some established state procedure,' the *Parratt* doctrine does not apply." *Id.* (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982)).  Such is the case here.  The determination of whether an unlicensed child ministry meets the exemption requirements is more akin to an established state procedure than a random and unauthorized act of a state official.

Moreover, as Rebirth argues, it is not clear that the FSSA's proposed judicial remedy would even provide a recourse for unlicensed child care ministries whose exemptions have been terminated.  The FSSA argues that Rebirth and other unlicensed child care ministries could bring an action in tort "for the negligent loss or intentional deprivation of property."  Defs.' Br. at 21.  In Indiana, however, there is no tort of "intentional deprivation of property.  The closest parallel is likely the tort of conversion, but conversion requires that a party have claimed possession of personal property of another, which clearly does not apply to the facts at issue here.  The FSSA's suggestion of negligence fairs no better.  At most, any duty of care a state agency owes to an entity like Rebirth is only the duty "to exercise ordinary and reasonable care." *E.g.*, *Laporte Cmty. Sch. Corp. v. Rosales*, 963 N.E.2d 520, 524 (Ind. 2012).  As Rebirth argues, a

26

simple error in the state agency's assessment of an unlicensed child care ministry would result in the child care ministry losing its exemption but yet would still likely meet the requisite level of care to avoid liability in a negligence action.  For these reasons, we cannot find that the potential availability of a post-deprivation judicial remedy suggested by the FSSA is sufficient to meet the requirements of due process.

## III.  Conclusion

In summary, we conclude that Rebirth acquired a protected property interest in its exemption from licensure as a child care ministry under the Due Process Clause of the Fourth Amendment such that the exemption cannot be terminated without providing Rebirth both notice of the impending termination and an opportunity to be heard.  For the reasons discussed above, neither the "plan of improvement" procedures nor the potential availability of post-deprivation judicial remedies satisfies due process standards. Defendants' Motion for Summary Judgment is therefore <u>DENIED</u> and Plaintiff's Motion for Partial Summary Judgment is <u>GRANTED</u>.

Rebirth requests that we issue an injunction ordering Defendants to provide an administrative appeal process for unlicensed child care ministries "substantially identical to that employed for child care homes and child care centers."  However, at this time, we do not direct in detail the type of process the FSSA must enact.  While we agree that the procedures currently provided child care home and child care centers will likely be quite instructive and may serve as a model for constitutionally adequate procedures to be provided to unlicensed child care ministries, without being apprised of the exact contours

of those procedures, we decline to order those specific procedures be applied to unlicensed child care ministries.  We instead encourage the parties to work together to reach an agreement regarding administrative procedures that meet the requirements discussed in this opinion.  The parties are ordered to file a joint status report to the court within sixty (60) days of the date of this entry outlining the agreed upon procedures, or, if they are unable to reach an agreement, to file separate status reports outlining their respective positions so that the Court may further address the issue.

IT IS SO ORDERED.

Date:   03/30/2015

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:


Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org

Rebecca A. Brelage
INDIANA ATTORNEY GENERAL
rebecca.brelage@atg.in.gov